## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| JAIRO DANIEL CASTILLO PALACIO and MARIO CARRILLO VALLEJO, | Criminal Action No. TDC-18-0619 |
| Defendants. | |

### MEMORANDUM OPINION

Defendant Jairo Daniel Castillo Palacio ("Castillo") has been charged with one count of Alien in Possession of a Firearm and Ammunition, and Defendant Mario Carrillo Vallejo ("Carrillo") has been charged with one count of Alien in Possession of Ammunition, both in violation of 18 U.S.C. § 922(g)(5). Pending before the Court are Castillo's Motion to Suppress Statements, Carrillo's Motion to Suppress Tangible and Derivative Evidence, and Carrillo's Motion to Suppress Statements. The Motions are fully briefed, and the Court held an evidentiary hearing on the Motions on October 22, 2019. For the reasons set forth below, Carrillo's Motions are both DENIED, and Castillo's Motion is GRANTED.

### FINDINGS OF FACT

At the suppression hearing on October 22, 2019, the Court heard testimony from Officers Evan Milano, Darby Dakkouni, and Mark McGinnis of the Gaithersburg, Maryland Police Department ("GPD"); Sergeant Raul Delgado of the GPD; and Detectives Scott Koogle and Jacque Cowan of the Montgomery County Police Department ("MCPD"). The Court also received as evidence photographs, documents, and video recordings of police interrogations of Defendants. Based on this record, the Court makes the following findings of fact.

## I.     The Traffic Stop

On August 9, 2018 at approximately 5:00 p.m., Officer Mark McGinnis of the Street Crimes Unit of the GPD, driving in an unmarked police vehicle, observed Defendant Castillo walking with another man near an apartment complex on North Summit Avenue in Gaithersburg, Maryland.   McGinnis recognized Castillo from a prior police encounter.   McGinnis then saw a minivan pull up alongside Castillo and the other man.   Both entered the minivan, which then drove off.   As McGinnis began to follow the minivan in his unmarked police vehicle, he electronically checked to see if there were any open warrants against Castillo.   While he was following the minivan, McGinnis received a report that Castillo had an outstanding arrest warrant for failure to appear to address traffic violations.   McGinnis radioed for assistance from other members of the Street Crimes Unit.   Three officers, Officer Milano, Officer Dakkouni, and Sergeant Delgado, responded in separate unmarked police vehicles and joined in the surveillance.

As McGinnis and the other police vehicles were following the minivan, McGinnis observed the minivan fail to stop at a stop sign before turning right onto Gerard Street.   The officers separately observed that the minivan was driving in a suspicious manner in that it was moving at a very slow rate of speed, was impeding traffic, appeared to be driving in circles around the same areas, including in and out of cul de sacs, and made at least one U-turn.

When the minivan pulled into a parking area and partially into a parking space, such that there was a possibility that the occupants would get out and walk away, the officers decided to stop the minivan.   Milano stopped his vehicle behind the minivan, slightly to its left, and the other officers arrived on the scene shortly after.   When the minivan driver attempted to back out of the parking space, Dakkouni, who had parked his vehicle nearby and was approaching the minivan on foot, tapped on the rear of the vehicle to get the driver's attention and announced, "Police, police."

2

Suppression Hr'g Tr. I at 45-46. The minivan stopped. Milano then approached the driver's window, showed his police badge, and asked in English and Spanish to see the driver's license. The driver stated that he did not have a license. There were five occupants in the minivan.

At the same time, McGinnis approached the sliding side door on the driver's side and encountered Defendant Carrillo seated in the middle row seat on the driver's side, with a blue backpack on the floor of the minivan near his left foot, next to the sliding door. Carrillo stood up to get out of the minivan and appeared to be trying to separate himself from the backpack, which he left behind. Because Carrillo appeared nervous and would not look at McGinnis, McGinnis asked Carrillo for permission to conduct a search of his person. After Carrillo consented and he had stepped out of the minivan, McGinnis conducted a pat frisk but found no weapons or contraband. Carrillo was not handcuffed, and McGinnis, who was in plain clothes, had not drawn his firearm. When McGinnis asked Carrillo if the backpack belonged to him, he acknowledged that it did. McGinnis asked Carrillo if he could search or look through the backpack. Carrillo responded by giving permission. As Carrillo stood next to McGinnis, McGinnis opened the backpack and found a knife, a ski mask, two pairs of gloves, binoculars, and a stocking containing five rounds of .357 ammunition. When asked where he obtained these items, Carrillo stated that he had found the backpack in the park. Carrillo also stated that the items in the backpack were items he wore to engage in "parkour," an activity involving physically navigating through outdoor spaces. Throughout this encounter, McGinnis spoke English, and Carrillo responded in a manner conveying that he understood the questions.

Meanwhile, Dakkouni and Delgado approached the passenger side of the minivan, and one of the occupants opened the sliding door from the inside. Dakkouni observed Castillo, who was seated on the driver's side of the third row of the minivan, move over to the passenger's side of

3

that seat. After the door was opened, both Dakkouni and Delgado smelled an odor of marijuana coming from inside the minivan. Delgado directed Castillo to step out of the vehicle and arrested him on the open warrant. During a search incident to arrest of Castillo's person, the officers found a bag containing marijuana in his front left pocket.

Based on the odor of marijuana and the marijuana found on Castillo's person, the officers ordered all of the occupants out of the vehicle and conducted a search of the minivan. In the pouch on the back of the middle row seat on the driver's side of the minivan, in which Carrillo had been seated, the officer recovered a handgun. The pouch was directly in front of the location where Castillo had been initially seated at the time of the traffic stop. Officers also found three baseball bats, a machete, a knife, a mask, and a roll of duct tape in the minivan.

After all of the occupants were out of the minivan, they were directed to sit on the curb. Shortly before the firearm was found, because of talking and movement among the group, the officers handcuffed all of the occupants. After approximately 30 minutes at the scene, both Defendants were transported to the police station and charged with unlawful possession of the firearm recovered from the minivan. Neither Castillo nor Carrillo were given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), at the scene of the traffic stop. McGinnis issued a traffic citation to the driver for failing to stop at a stop sign and for driving without a license.

## II.    Carrillo Interrogation

At the police station following the traffic stop, Sergeant Delgado and Officer McGinnis began an interview of Carrillo. Delgado, who is a fluent Spanish speaker, read *Miranda* rights to Carrillo in Spanish from a Spanish advice of rights form. Specifically, Delgado asked Carrillo if he could read in Spanish. When he stated that he could, Delgado directed Carrillo to read out loud the heading of the form, which read "Advice of Rights" in Spanish. Carrillo did so. After

4

confirming that Carrillo was not under the influence of any alcohol or medication and determining that Carrillo had attended high school up to the tenth grade, Delgado then read the specific rights directly from the form. He told Carrillo, "I'm gonna read them to you and then we'll initial each line and mark yes, if not we're gonna . . . talk. OK?" Carrillo Tr. 3, ECF No. 78-1. After reading the right to remain silent, Delgado asked, "Do you understand that?" *Id.* In response, Carrillo nodded yes. After telling Carrillo that "[a]nything you say can be used against you," Delgado asked, "Understand?" *Id.* After informing Carrillo that he had the right to an attorney and that if he could not obtain one, an attorney would be made available to him, Delgado asked, "Do you understand that?" *Id.* After each such question, as seen on the video recording, Carrillo nodded in the affirmative. In addition, after each right was read from the Advice of Rights form, Carrillo put his initials next to the corresponding language on the form. Finally, after reading the rights, Delgado asked Carrillo if he understood everything that had been said. Carrillo nodded in the affirmative.

### III.    Castillo Interrogation

After Castillo was transported to the MCPD police station in Gaithersburg, MCPD Detective Scott Koogle, a member of the MCPD Gang Investigations Unit who speaks both English and Spanish, came to the station to interview Castillo. At approximately 7:57 p.m., Koogle went into an interrogation room and asked Castillo biographical questions in Spanish. At that time, Koogle did not administer *Miranda* warnings. According to Koogle, he did not do so pursuant to a standard procedure to delay giving *Miranda* warnings in order to first build a rapport with the suspect. After receiving the biographical information, Koogle left to run the information through databases.

At 8:49 p.m., Koogle returned to the interrogation room with Detective Jacque Cowan of the MCPD Firearms Investigation Unit. Koogle and Cowan had not worked together before. Cowan, who had just arrived at the police station, assumed that Castillo, who had been arrested hours before, had already received *Miranda* warnings. Although aware that Castillo had not yet received *Miranda* warnings, Koogle did not tell Cowan of that fact. Rather, Koogle planned again to delay giving *Miranda* warnings to Castillo based on the same standard procedure.

As the interview began at 8:49 p.m., Cowan asked the questions in English, and Koogle translated the questions into Spanish for Castillo and the answers into English for Cowan. Cowan informed Castillo that he had been brought to the police station because the officers found a gun in the minivan directly in front of him. He told Castillo that there had been a warrant against him relating to traffic tickets, so the police knew that he was "wanted when they stopped the car." Castillo Tr. 3, ECF No. 76-1. Castillo acknowledged that he knew there was a warrant against him. Cowan then told Castillo, "The only reason I am here is because of the gun." *Id.* at 4. He then asked Castillo whether he had touched the gun. Castillo responded that he had. Cowan asked "How long? Did [you] touch it to take it to the car, or was it already in the car and [you] touched it in the car?" *Id.* Castillo responded, "I touched it inside the car" and acknowledged that he brought it to the car. *Id.* When Koogle asked, "How's that?", Castillo repeated, "I touched it." *Id.* Asking for clarification, Koogle asked, "Inside the car or you took it to the car?" *Id.* Castillo admitted, "The truth, the truth I had it . . . I touched it." *Id.* When Cowan told him that they would charge him with the gun, and not the others in the minivan, Castillo again stated that he was carrying the gun.

Cowan then asked how long Castillo had the gun. Castillo stated that the did not remember. When Cowan asked whether it had been months, years, or days since he obtained the gun, Castillo

stated that it had been about a week. Cowan then asked if he remembered where he got the gun. Castillo responded, "I got it on the street." *Id.* at 5. Cowan asked whether he bought the gun or found the gun, and Castillo responded, " I bought it." *Id.* Cowan then asked for the location where he bought the gun. Rather than responding directly, Castillo asked whether it is a serious offense to have a gun. Cowan asked Castillo how old he was, to which Castillo responded that he was 22 years old. Cowan then told Castillo that he could have a gun if he was 22 and did not have a criminal record. When asked to clarify, Cowan told him that he could have a gun but could not carry it with him in a car. Throughout this questioning, when Cowan asked a question, Koogle translated it into Spanish for Castillo.

This line of questioning lasted approximately four minutes. At that point, at 8:54 p.m., Koogle began to ask questions in Spanish to establish that Castillo was not under the influence of any drugs or alcohol, then he administered *Miranda* warnings. After the warnings were delivered, Cowan stated that he was going to "go back over it," introduced himself, and told Castillo that the Gaithersburg police had stopped him because there was an arrest warrant. *Id.* at 7. He then asked Castillo if the gun was in front of him. Castillo acknowledged that it was. Cowan then told Castillo, "You already told us . . . you bought the gun on the street" and then asked how much he had paid for the gun. *Id.* at 8. Castillo stated that he had bought it for $200. When asked if he had ever shot the gun, he responded negatively. The questioning continued for another 15 minutes, with Castillo describing his history of coming to the United States from El Salvador and explaining that he needed the gun for protection. Castillo was then subjected to another 30 minutes of questioning involving a third officer, followed by two additional sessions on different topics.

## DISCUSSION

Defendants have each filed Motions to Suppress. Carrillo has filed a Motion to Suppress Tangible and Derivative Evidence, ECF No. 52, in which he seeks suppression of the items seized during the traffic stop on August 9, 2018 and any statements that he made at the scene. Carrillo has also filed a separate Motion to Suppress Statements, ECF No. 51, in which he seeks suppression of the statements made by Carrillo (1) at the scene of the traffic stop as beyond the scope of a valid traffic stop and (2) during the post-arrest interrogation that day based on the claim that he did not properly waive his *Miranda* rights. Castillo has filed his own Motion to Suppress Statements, ECF No. 36, in which he seeks suppression of the statements made in his post-arrest interrogation by Koogle and Cowan based on the failure to administer *Miranda* warnings at the outset of the interview.

## I.     Carrillo's Motion to Suppress Tangible and Derivative Evidence

In this Motion, Carrillo seeks suppression of the ammunition and other contents of the backpack, his cell phone and its contents, and any other items seized from the minivan, presumably including the firearm, knife, machete, and baseball bats. He also seeks suppression of any statements he made at the scene of the traffic stop. Carrillo argues that the officers obtained this evidence in violation of the United States Constitution because: (1) the traffic stop was invalid; (2) the search of the backpack and the vehicle were not supported by valid consent or probable cause; and (3) because Carrillo was not free to leave the scene, he was effectively under arrest and could not be questioned without *Miranda* warnings. Based on the evidence presented at the suppression hearing, the Court finds that the traffic stop, search, and questioning of Carrillo complied with the Fourth and Fifth Amendments.

Ordinarily, a traffic stop is the equivalent of an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), for which reasonable suspicion is required. *Rodriguez v. United States*, 575 U.S. 248, 254 (2015). At the time that the GPD officers conducted a traffic stop of the minivan on August 9, 2018, McGinnis was aware that one of its occupants, Castillo had an open arrest warrant. He had prior familiarity with Castillo, observed Castillo get into the minivan before it drove off, and ran a records check to determine that there was an outstanding warrant. Knowledge that an occupant of a vehicle has an outstanding arrest warrant provides a sufficient basis to support a traffic stop to arrest that individual. *See United States v. Hensley*, 469 U.S. 221, 232 (1985). Moreover, as he was following the minivan, McGinnis observed at least one specific traffic violation, the failure of the driver to stop at a stop sign before making a right turn onto Gerard Street, which is a violation of Md. Code. Ann., Transp. § 21–707(a) (2012). Where the police have probable cause to believe that a traffic violation has occurred, an investigatory stop of a vehicle is justified even if there is another motivation for the stop. *See Whren v. United States*, 517 U.S. 806, 810 (1996). The stop was therefore valid. Furthermore, it is firmly established that during a valid traffic stop, the police may require the driver and all passengers to exit the vehicle without any additional justification. *See Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997).

Carrillo primarily challenges the recovery of the evidence from the backpack. Based on the testimony of McGinnis, the Court agrees with the Government that Carrillo consented to the search. Consent to search is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Government has the burden to prove "that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "In determining whether consent to search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined." *United States v.*

*Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth*, 412 U.S. at 227). "Relevant factors include the officer's conduct, the number of officers present, the time of the encounter, and characteristics of the individual who was searched, such as age and education. Whether the individual searched was informed of his right to decline the search is a highly relevant factor." *United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013) (internal citation omitted).

Here, when McGinnis encountered Carrillo, he specifically asked him if he could search or look through the backpack located at Carrillo's feet. Carrillo agreed. McGinnis emphasized that he asked a direct question, because he understands the significance of a request for consent. The Court credits McGinnis's testimony that he asked for and received consent to search the backpack. As for the remaining factors, the request for consent occurred during a traffic stop that occurred at approximately 5:00 p.m., not late at night. Although it involved four police officers, all were in plain clothes, no firearms were drawn, and because there were five occupants, only one officer, McGinnis, dealt with Carrillo. Although English is not Carrillo's first language, McGinnis provided undisputed testimony that, when he asked questions of Carrillo, Carrillo answered in a manner revealing that he understood the questions. While certain factors, such as Carrillo's age of 19 at the time of the incident, his limited, tenth grade education, and the lack of any specific instruction that he had the right not to consent weigh against consent, they do not overcome the uncontroverted evidence that McGinnis requested and obtained consent, that Carrillo understood the request, and that he was not subjected to any coercion. The Court therefore finds that Carrillo knowingly and voluntarily consented to the search of the backpack.

The Court also finds that the remaining physical evidence recovered from the minivan was lawfully obtained. When Dakkouni and Delgado approached the passenger's side of the minivan as part of a lawful stop to arrest Castillo and address a traffic violation, the sliding door opened,

and the officers smelled an odor of marijuana coming from the vehicle. Where this testimony is partially corroborated by the fact that the officers recovered marijuana from Castillo's person during a valid search incident to arrest on the outstanding warrant, the Court credits the officers' testimony even where the other officers, positioned on the other side of the minivan, did not detect such an odor. An odor of marijuana is sufficient by itself to support probable cause to conduct a search of the passenger compartment of the vehicle. *See United States v. Lewis*, 606 F.3d 193, 198 (4th Cir. 2010); *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004). The fact that possession of a small quantity of marijuana is now a civil violation in Maryland does not change this conclusion. Under *Florida v. Harris*, 133 S. Ct. 1050 (2013), a search may be conducted under the Fourth Amendment if there is probable cause to believe that "contraband *or* evidence of a crime" will be found. *Id.* at 1055. The Maryland Court of Appeals has held that even after decriminalization, "possession of marijuana in any amount remains illegal," such that marijuana remains contraband and a law enforcement officer may still search a car for marijuana based on an odor of marijuana emanating from the vehicle, because there is probable cause to believe the car contains contraband. *Robinson v. State*, 152 A.3d 661, 680, 683 (Md. 2017). As the court noted, the Maryland marijuana decriminalization statute, Md. Code Ann., Crim. Law § 5–601(d)(2), expressly states that it "may not be construed to affect the laws relating to . . . seizure and forfeiture." *Robinson*, 152 A.3d at 680; *see also Bowling v. States*, 134 A.3d 388, 398 (Md. Ct. Spec. App. 2016) (holding that post-decriminalization, an officer still has probable cause to search a vehicle based on an odor of marijuana because marijuana remains contraband). Thus, based on the odor of marijuana, the officers could prolong the encounter and conduct a search of the vehicle.

Where there was probable cause to search the minivan, the officers lawfully seized the baseball bats and other items that were in plain view on the floor of the minivan. Because drugs could be found in a place such as the pouch in back of the driver's side middle row seat, the officers properly searched that area and recovered the firearm. *See Horton v. California*, 496 U.S. 128, 133, 136-37 (1990).

The Court also finds that the fact that the officers had probable cause to search the minivan for drugs provides a second basis to uphold the search of the backpack. During a vehicle search based on probable cause, the police may search a passenger's purse or other containers if it is capable of holding the contraband at issue. *See Wyoming v. Houghton*, 526 U.S. 295, 307 (1999). Here, because the backpack could contain marijuana, such a search would be valid. Although as a matter of timing, McGinnis may have actually searched the backpack before the decision was made to search the vehicle based on the odor of marijuana, any such discrepancy does not matter. Under the inevitable discovery doctrine, if the Government can establish that evidence acquired as a result of illegal governmental activity "ultimately or inevitably would have been discovered by lawful means," the evidence may be admitted. *Nix v. Williams*, 467 U.S. 431, 444 (1984). Here, McGinnis testified that when GPD conducts a vehicle search for marijuana or drugs, it is standard procedure to search all containers found within the vehicle. Thus, even if there were no valid consent for the search of the backpack, the officers would have validly searched the backpack under the automobile exception to the warrant requirement and would have therefore inevitably discovered the ammunition and other items found in the backpack. For the foregoing reasons, the Motion to Suppress Tangible and Derivative Evidence will be denied. To the extent that this Motion also sought suppression of statements at the scene of the traffic stop, that issue will be addressed as part of the analysis of Carrillo's Motion to Suppress Statements.

## II.    Carrillo's Motion to Suppress Statements

### A.    Statements at the Scene

Carrillo first seeks suppression of the statements he made at the scene of the traffic stop, including those relating to the contents of the backpack. The Court, however, finds that the statements were lawfully obtained. As discussed above, where McGinnis displayed no weapon and made no coercive statements, the Court concludes that Carrillo's statements were voluntary. The Court also rejects Carrillo's argument that at the time of his statements, he was under arrest and thus entitled to *Miranda* warnings. In particular, Carrillo focuses on the undisputed fact that Carrillo and the other occupants were not free to leave the scene during the encounter. In conducting a *Terry* stop, including a traffic stop, the police are permitted to briefly detain individuals, such that they are not free to leave, without transforming the encounter into a formal arrest of those individuals. *See Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). However, the police may not prolong the encounter, absent additional justification, beyond the scope and duration required to address the original purpose of the traffic stop. *Rodriguez*, 135 S. Ct. at 1612 (holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures"). Here, at the time of McGinnis's search and questioning of Carrillo, the officers had not exceeded their mandate. Where one of the bases for stopping the minivan was to arrest Castillo, the officers could validly approach with multiple officers, order him and the others out of the vehicle, and conduct a search incident to arrest on Castillo. While that activity was occurring, McGinnis could conduct limited questioning of Carrillo, including requesting consent to search his person and the backpack. When the search of the backpack revealed ammunition, a ski mask, and gloves, McGinnis had additional information supporting a reasonable suspicion of criminal activity that would justify follow up

13

questions within the scope of a *Terry* stop. Indeed, a certain amount of questioning during a *Terry* stop is contemplated and does not necessarily convert the encounter into a custodial interrogation. *See United States v. Leshuk*, 65 F.3d 1005, 1110 (4th Cir. 1995). The limited questions about the contents of the backpack were, under the circumstances, within the scope of a permissible *Terry* stop.

The Court further finds that at the time of the consent search and questioning, Carrillo was not in custody and thus not entitled to *Miranda* warnings. Whether a suspect is in custody for purposes of *Miranda* warnings is based on whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer*, 468 U.S. at 440; *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010). The key question is whether, viewed objectively, "a reasonable person in the suspect's position would have understood his position" as being "in custody." *Berkemer*, 468 U.S. at 422; *Hargrove*, 625 F.3d at 178. At the time of McGinnis's questioning of Carrillo outside the minivan, McGinnis had not drawn his firearm, physically restrained Carrillo, or handcuffed him. He had not told Carrillo that he was under arrest or would be taken into custody. Where the exchange occurred soon after the traffic stop, within the scope of a valid *Terry* stop, a reasonable person would not have concluded that he was in custody, so *Miranda* warnings were not necessary. The Motion will be denied as to Carrillo's statements at the scene of the traffic stop.

## B. Statements at the Police Station

Carrillo also seeks suppression of statements made during his interrogation at the police station following his arrest on August 9, 2018 on the grounds that the *Miranda* warnings were inadequate to establish that Carrillo knowingly, intelligently, and voluntarily agreed to waive his rights and speak to the police.

Under *Miranda*, statements made during a custodial interrogation are admissible only if the Government establishes that law enforcement officers both (1) adequately informed the defendant of his Miranda rights and (2) obtained a waiver of those rights. 384 U.S. at 444. To be valid, a waiver of Miranda rights must have been (1) "voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The questions of whether the waiver was uncoerced and based on sufficient comprehension of the rights and the consequences of waiving them is based on the "totality of the circumstances surrounding the interrogation," including the characteristics of the defendant, the setting of the interview, and details of the interrogation. *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).

Here, the record shows that Carrillo was advised of the *Miranda* rights in Spanish and initialed each right on the Advice of Rights form. The *Miranda* rights were administered in a professional tone, with no evidence of threats or coercion. At the time of the waiver, Carrillo was in a police interrogation room but was not physically restrained. Although Carrillo had limited education, he was an adult at the time of the interview, was able to read, and displayed no signs that he did not understand his rights.

As to specific arguments, although Carrillo complains that he was not specifically informed that he had the right to refuse to answer questions, that right is contained in the warning that he has the right to remain silent. *See United States v. Frankson*, 83 F.3d 79, 81 (4th Cir. 1981) (holding that *Miranda* warnings do not require a specific, verbatim statement of language, but that the "warnings reasonably convey to a suspect his rights"). Carrillo further notes that the transcript of the video recording does not reflect that he actually responded when Delgado asked if he

understood each right. However, a review of the video recording itself reveals that he nodded in the affirmative to such questions. More specifically, the video recording reflects that when Delgado asked at the end of the recitation of *Miranda* rights, "Have you understood everything I've said to you?", Carrillo nodded in the affirmative. Carrillo Tr. 3.

Carrillo also argues that although he was informed of his *Miranda* rights, he was not affirmatively asked, and did not affirmatively state, that he was agreeing to waive his *Miranda* rights and speak to officers. He states that he was not told that initialing next to the right signified that he was waiving the right. Although the Advice of Rights form lists all of the *Miranda* rights, it does not contain a line for the interviewee to state that he is waiving those rights. A *Miranda* waiver, however, need not be explicit and may be implied, such as when the defendant is read his rights, states that he understands them, and then proceeds to answer questions. *See United States v. Hicks*, 748 F.2d 854, 859 (4th Cir. 1984). That is what happened here. When the totality of circumstances are considered, the Court finds that Carrillo knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Finally, to the extent that Carrillo claims that his statements during the subsequent interview should be suppressed as not voluntary, the evidence establishes that he was not coerced and responded to questions voluntarily. In assessing whether a statement was voluntary, the crucial inquiry is whether the subject's will has been overborne" or his "capacity for self-determination critically impaired. *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987). The court examines "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. *Id.* Here, there were three officers involved in the interview. The officers did not display firearms or otherwise make a show of force. A review of the video

recording reveals that they spoke in a professional tone and did not threaten or pressure Carrillo in ways that would overcome his will. Rather, the video shows that the Defendant spoke freely. Despite his age, limited education, and limited experience with the criminal justice system, there is no evidence that he was not acting out of free will. Thus, the Court finds that Carrillo's statements were voluntary. Accordingly, the Motion to Suppress Statements will be denied.

## III.    Castillo's Motion to Suppress Statements

In his Motion, Defendant Castillo seeks suppression of statements made during his custodial interrogation following his arrest after the traffic stop. It is undisputed that the interrogating officers from MCPD did not initially give him *Miranda* warnings. They interviewed him from approximately 8:49 p.m. to 8:54 p.m. before administering the warnings. During that time period, Castillo was asked at least 10 questions relating to his arrest warrant, the history of the firearm, and his possession of the firearm. During that time, Castillo admitted that he had bought the firearm and that he had brought the firearm to the car in which it was found. After he made these admissions, the interrogating police officers administered *Miranda* warnings, asked the same or similar questions as those asked before the warnings were given, and received the same or similar answers. Although the Government has agreed that it will not seek to introduce statements made by Castillo before he received *Miranda* warnings, Castillo seeks suppression of all statements made after he received *Miranda* warnings as well.

Under *Oregon v. Elstad*, 470 U.S. 298 (1985), "absent deliberately coercive or improper tactics in obtaining an initial statement, the mere fact that a suspect made an unwarned admission does not warrant a presumption that later statements made after proper *Miranda* warnings were compelled. *Id.* at 314. The Court rejected the theory that where the pre-warning questioning "let the cat out of the bag," later statements were tainted and subject to suppression. *Id.* at 311. Whether

the post-warning statements were voluntary depends on consideration of the surrounding circumstances, including "the entire course of police conduct." *Id.* at 318.

However, in *Missouri v. Seibert*, 542 U.S. 600 (2004), the United States Supreme Court held that where the police employ a "question first" strategy by which they deliberately ask questions without *Miranda* warnings in order to elicit incriminating statements, then give warnings and seek to confirm the prior statements, the post-warning statements are subject to suppression. *Id.* at 613. Based on *Seibert*, the United States Court of Appeals for the Fourth Circuit held that although *Elstad* generally applies, when the police "deliberately employ" a question first strategy, "postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken before the post-warning statements are made." *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005). In considering whether such a strategy was employed, courts are to consider "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615; *Mashburn*, 406 F.3d at 308.

Here, it is undisputed that before any *Miranda* warnings were given to Castillo, the interrogating officers, Detectives Koogle and Cowan, asked questions about the crime that were intended to, and did, elicit incriminating statements connecting Castillo to the firearm found in the minivan. After Castillo admitted that he had bought the firearm and brought it to the minivan, Koogle administrated *Miranda* warnings, then Cowan asked the same or similar questions asked before the warnings to obtain post-*Miranda* incriminating admissions. In an unusual scenario, the two detectives had different knowledge and different motivations in conducting the interview. On

the one hand, Koogle was fully aware that Castillo had not received *Miranda* warnings at the time

of his arrest, during an earlier interview when Koogle asked Castillo for biographical information,

or at the outset of the formal interrogation. Rather, Koogle acknowledged that he deliberately

refrained from giving *Miranda* warnings before both interviews in which he participated as part of

a standard procedure to try to build a rapport with a suspect before giving *Miranda* warnings.

Thus, Koogle was employing a "question first" strategy, though he claimed that he did not intend

to ask Castillo questions that could elicit incriminating statements, but instead planned to ask only

background questions before giving *Miranda* warnings. On the other hand, Cowan, who arrived

at the police station separately, was a member of a separate investigative unit from Koogle, had

not worked with him before, and had no involvement in the investigation until the formal

interrogation, assumed from the passage of time that *Miranda* warnings had been given but made

no inquiry of Koogle or anyone else to confirm that belief.

Under these circumstances, the Court finds that the police were effectively employing an

improper "question first" strategy under *Seibert*. "[T]here is rarely, if ever, a legitimate reason to

delay giving a *Miranda* warning until after the suspect has confessed." *United States v. Williams*,

435 F.3d 1148, 1159 (9th Cir. 2006). Koogle admitted that he deliberately withheld *Miranda*

warnings from Castillo at the outset of the formal interrogation, and the warnings were not

administered until after Castillo essentially confessed to the crime of unlawful firearm possession.

Koogle stated that under his "question first" strategy he intended only to elicit background

information and build a rapport with Castillo during such questioning, not to elicit incriminating

statements, and that the failure to give *Miranda* warnings before questions about the crime were

asked was inadvertent. That account, however, cannot be squared with the other evidence in the

record. First, Koogle acknowledged that he had already employed the same "question first"

strategy earlier in the evening when he asked Castillo about background information without having administered *Miranda* warnings, purportedly to build rapport with Castillo. Thus, there was no reason to repeat that exercise before the formal interrogation. Second, there was no way to successfully employ a "question first" strategy limited to background questions without having first discussed it with Cowan, who was taking the lead in the questioning. Yet Koogle did not tell Cowan before the interview of his plan and did not advise him to limit his questions to seeking background information until Koogle decided to administer *Miranda* warnings. Third, although Koogle claims that he did not expect Cowan to ask questions about the crime and inadvertently failed to intervene and administer *Miranda* warnings until after several had already been asked and answered, such an explanation fails in light of the specific circumstances of the interview. Tellingly, Cowan did not start the interrogation by making small talk or asking background questions; rather, his first statement was to tell Castillo that he was in custody because the police had found a firearm in the minivan in front of where he had been sitting. Significantly, because it was understood that the interview would have to be conducted in Spanish but Cowan did not speak that language, all questions by Cowan had to be translated into Spanish by Koogle for the benefit of Castillo, and all responses by Castillo had to be translated into English by Koogle for the benefit of Cowan. Thus, there was no way for Cowan to transmit a question to Castillo without Koogle first hearing the question and taking the time to translate it. Where Koogle was effectively screening every question before it was actually posed to Castillo, the Court cannot credit the assertion that he inadvertently failed to recognize that Cowan's questions sought information about the crime. Even if that explanation could be accepted for one or two questions, Cowan asked, and Koogle translated, over 10 questions or statements relating to the crime before the *Miranda* warnings were actually given.

Although Koogle claims that at some point before the *Miranda* warnings were actually given, he pushed an Advice of Rights form to Cowan to signal that *Miranda* warnings needed to be given, the video recording is inconclusive on when that action occurred. To the extent that the Government is correct that Koogle passed an Advice of Rights form to Cowan at 8:52 p.m., at that point Castillo had already thoroughly incriminated himself. Moreover, even after that point, the discussion continued for another minute, possibly two, before the initiation of *Miranda* warnings. Such a gap between that action and the initiation of *Miranda* warnings undermines, rather than supports, the Government's position. Had the failure to give *Miranda* warnings been truly inadvertent, Koogle would have immediately cut off the discussion, which he had complete control to do by virtue of his role as translator. Notably, in the end it was Koogle, not Cowan, who read the *Miranda* warnings directly to Castillo in Spanish, illustrating that there was no need for Koogle to wait for Cowan before administering the *Miranda* rights.

Consideration of the applicable factors in identifying a question first strategy further supports the conclusion that such an approach was employed here. As to "the completeness and detail of the questions and answers in the first round of interrogation," the pre-*Miranda* warning questioning, while not lengthy, included multiple questions that effectively established Castillo's guilt, including his admissions that he had bought the firearm and that he brought it to the minivan. As to "the overlapping content of the two statements," after the *Miranda* warnings were issued, Cowan went back to the same line of questioning as before the warnings and specifically reconfirmed certain facts. *Seibert*, 542 U.S. at 615. Indeed, Cowan reminded Castillo that he had "already" told them that he had bought the gun, such that it was clear that the detectives and Castillo "treated the second round as continuous with the first." *Id.* Unlike in *Elstad*, where the pre-Miranda questioning occurred at the defendant's home and the post-*Miranda* questioning

occurred an hour later at the police station, *Elstad*, 470 U.S. at 300-01, the post-*Miranda* questioning of Castillo occurred immediately after the pre-*Miranda* questioning, with no break, in the same interrogation room, by the same officers. *See Seibert*, 542 U.S. at 615 (excluding post-*Miranda* statements where there was only a 15 to 20 minute break between the pre- and post-*Miranda* interviews); *Mashburn*, 406 F.3d at 308. Upon review of these factors, courts have found that when a defendant gave an incriminating statement without the benefit of *Miranda* warnings, post-*Miranda* incriminating statements were subject to suppression when they related to the same topic, were given to the same law enforcement officers in the same location, and were made immediately following the pre-*Miranda* statements. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 428 (6th Cir. 2008) (finding that the post-*Miranda* statements were "the result of a single, unwarned sequence of questioning"); *United States v. Ollie*, 442 F.3d 1135, 1141(8th Cir. 2006) (concluding that where the defendant orally confessed during an interrogation without *Miranda* warnings, was then promptly given *Miranda* warnings, then provided a written confession to the same police officer, the post-*Miranda* confession should be suppressed because the two sessions were "parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what been said before").

Considering all of these facts, the Court finds that, regardless of the original intent behind the "question first" strategy, by the time it was actually executed, Koogle was knowingly and deliberately eliciting incriminating information before the *Miranda* warnings were administered. *See Seibert*, 542 U.S. at 616 n.6 (stating that because the intent of an officer is rarely candidly admitted, "the focus is on facts apart from intent that show the question-first tactic at work"). The fact that Cowan may have assumed that *Miranda* warnings had been given, and did not deliberately ask incriminating questions before such warnings were given, does not alter this conclusion. Even

though Cowan was taking the lead in asking the questions, Koogle had been involved in the investigation before Cowan and had superior knowledge about whether *Miranda* warnings had been given, yet he never shared that information with Cowan. *See United States v. Stewart*, 536 F.3d 714, 722 (7th Cir. 2008) ("The determination of whether a question-first strategy was deliberately used does not require an inquiry into the state of mind of *every* officer involved in the interrogation."). If Cowan's unwitting involvement in a question first strategy could be deemed to absolve the police of wrongdoing, the police would be incentivized to withhold information about *Miranda* warnings from interrogating officers so as to be able to claim that the actual interviewer lacked knowledge of such a strategy. Thus, the actions and motivations of the interrogation team are properly considered collectively. The interrogation team's collective action was to deliberately withhold *Miranda* warnings for strategic reasons, and to knowingly allow questions designed to elicit incriminating statements to be put to Castillo before such warnings were given. In that sense, this case differs from *Wallace v. Branker*, 354 F. App'x 807 (4th Cir. 2009), cited by the Government, in which the officers elicited no incriminating information prior to administering *Miranda* warnings. *Id.* at 817.

Accordingly, as in *Seibert*, there was a police strategy to "undermine the *Miranda* warnings" such that by the time the pre-*Miranda* warning questioning stopped, "there was little, if anything, of incriminating potential left unsaid." *Seibert*, 542 U.S. at 616. Under such circumstances, the *Miranda* warnings "could not lead a suspect to a meaningful understanding that he could cease answering the questions at that point in time." *Pacheco-Lopez*, 531 F.3d at 427. Thus, where such a strategy was pursued, the post-warning statements "must be excluded unless curative measures are taken before the post-warning statements are made." *Mashburn*, 406 F.3d at 309. After giving *Miranda* warnings, however, neither Koogle nor Cowan said anything "to

counter the probable misimpression" that the warning that anything Castillo said could be used against him also applied to "the details of the inculpatory statement previously elicited." *Seibert*, 542 F.3d at 309. They did not tell him that his pre-*Miranda* statements could not be used against him. *See id.* Rather, as in *Seibert*, Cowan specifically referred back to the confession already given when he reminded Castillo that he had already admitted buying the gun, such that "a reasonable person in the suspect's shoes would not have understood" the warnings "to convey a message that [he] retained a choice about continuing to talk." *See id.*; *Ollie*, 442 F.3d at 1141 (finding that the post-*Miranda* confession should be suppressed where it was provided after the police officer asked the defendant to reaffirm what he had said in the pre-*Miranda* statement). In the absence of curative action, the post-warning statements must be suppressed.

## CONCLUSION

For the foregoing reasons, Carrillo's Motion to Suppress Tangible and Derivative Evidence and Motion to Suppress Statements will be DENIED, and Castillo's Motion to Suppress Statements will be GRANTED. A separate Order shall issue.

Date:  December 12, 2019

THEODORE D. CHUANG
United States District Judge